### UNITED STATES of America, Plaintiff–Appellee,

v.

### Keith SHERLIN (94–6111) and Tracy Teague (94–6112), Defendants–Appellants.

### Nos. 94–6111, 94–6112.

United States Court of Appeals, Sixth Circuit.

Argued May 23, 1995.

Decided Oct. 18, 1995.

Gary Humble, Asst. U.S. Atty. (argued and briefed), Office of the U.S. Attorney, Chattanooga, TN, for U.S.

Howell G. Clements (argued and briefed), Chattanooga, TN, for Keith Sherlin.

Keith Sherlin, Manchester, KY, pro se.

Perry H. Piper (argued and briefed), Federal Defender Services of Eastern Tennessee, Inc., Chattanooga, TN, for Tracy Teague.

Before KENNEDY, JONES, and KRUPANSKY, Circuit Judges.

NATHANIEL R. JONES, Circuit Judge.

Defendants Keith Sherlin (No. 94–6111) and Tracy Teague (No. 94–6112) appeal their convictions. We affirm in each case.

Both were named in a seven-count superseding indictment filed on April 28, 1994, which included charges of conspiracy to commit arson in violation of 18 U.S.C. § 844(i), arson with personal injuries in violation of 18 U.S.C. §§ 844(i) and 2, and perjury in violation of 18 U.S.C. § 1623. Sherlin was found guilty of conspiracy to commit arson (Count I), arson with personal injuries (Count II), and perjury (Counts III–V). Sherlin was sentenced to a total of 235 months in prison and restitution in the amount of $1,377,-892.31. Teague was found guilty of conspiracy to commit arson (Count I) and perjury (Counts VI–VII), but the jury returned a not guilty verdict with respect to the arson charge (Count II). He was sentenced to a total of 64 months in prison and restitution in the amount of $1,377,892.31. On appeal, the Defendants question the sufficiency of the evidence to sustain their convictions, the admission or denial of certain evidence, the district court's denial of a severance motion, subject matter jurisdiction, and the district court's refusal to review a presentence report of a government witness prior to cross-examination of the witness.

## I.

At trial, the evidence revealed that on November 4, 1993, Keith Sherlin, Tracy Teague, and Charlie Jacks travelled to the campus of Lee College in Cleveland, Tennessee, and set fire to the Ellis Hall dormitory with seventy-six sleeping students inside. This act was the culmination of a series of events that began on October 4, 1993. On that date, Sherlin, Stacy Miller, and Milford Weathers, Sherlin's cousin, went to the Lee College campus and provoked an argument with some students. Subsequently, Miller went to his house and, accompanied by Sherlin and Weathers, returned to the campus with a shotgun. The shotgun was discharged in the direction of some students, and Miller and Sherlin were charged with four counts of felonious reckless endangerment. As a result of this incident, Sherlin swore that he would get revenge. The Ellis Hall fire apparently was Sherlin's revenge.

Sherlin made several statements to friends that he would seek revenge. Shortly before the fire, he travelled with Tracy Teague to Lisa Pritchett's apartment. In the presence of Teague, Pritchett, J.J. Rodgers, and Pritchett's boyfriend, Keith Mitchell, Sherlin discussed the October 4 shotgun incident, and he promised that he would get revenge. On another occasion, he visited his ex-girlfriend, Christy Vandergriff. Again, Sherlin

swore that he would seek revenge on Lee College.

On the evening of November 3, 1993, Sherlin, Teague, Jacks, and Rodgers met at Jacks' brother's apartment. Sometime after midnight, Sherlin obtained gasoline and placed it in the trunk of Charlie Jacks' car. Sherlin then asked his buddies if they would "help him get some revenge." Around 2:00 a.m., the four men travelled to Lee College, and Sherlin stated to Rodgers that it "was time to get even." Sherlin told Teague to act as a lookout, watching for security guards and others. Rodgers, being scared to death, remained in the car. Sherlin, Teague, and Jacks were unaware that a Lee College student watched them move from their parked car to Ellis Hall.

While Teague acted as a lookout, Sherlin and Jacks entered the Ellis Hall dormitory prayer room. Sherlin directed Jacks to pour gasoline on the floor, and Jacks complied. Sherlin struck a book of matches and threw them down on the floor. Sherlin and Jacks then ran from Ellis Hall. They picked up Teague and ran to the car. Again, unknown to Sherlin, Teague, and Jacks, a Lee College student watched them run from Ellis Hall and return to Sherlin's vehicle.

The three men jumped into the car and left the scene. About the time that the fire trucks arrived, Sherlin, Teague, and Jacks returned to the scene of the fire. The three of them watched as Ellis Hall burned.

All three suspects appeared before a grand jury investigating the arson. While they all admitted their presence at Charlie Jacks' brother's apartment, they initially claimed that they were watching a movie at the time of the fire. Sherlin claimed that after the movie was completed he returned home. Jacks rendered the same statement, and Teague testified that after Sherlin left Jacks' brother's apartment, he did not see him for the remainder of the morning. All three denied any knowledge of the fire.

Eventually, Teague admitted to the authorities that he travelled to the Lee College campus that morning with Sherlin, Jacks, and Rodgers. He claimed that Sherlin told him to "watch out," while Sherlin and Jacks went toward Ellis Hall. Shortly after Teague's statement, Jacks and Rodgers both broke down and admitted that they had previously lied to the grand jury when they denied knowledge of the fire. Jacks admitted his involvement. Jacks and Rodgers pled guilty to all counts in which they were charged in the original indictment. Neither entered a plea agreement with the government.

As a result of the fire, seventeen students were injured. Three were severely injured. The injuries included broken bones and third degree burns.

After Sherlin and Teague were convicted, these appeals timely followed.

## II. Common Issues

### A. Lack of Federal Jurisdiction

■ Both Sherlin and Teague argue that the district court erred in failing to dismiss the arson and conspiracy counts for lack of federal jurisdiction. They claim that their alleged act of arson did not involve interstate commerce and was not within the powers granted by the U.S. Constitution pursuant to Article I, Section 8, Clause 3.

In part, Sherlin and Teague were charged with violating section 844(i) of Title 18 of the United States Code, which stated the following in pertinent part at the time the Defendants committed the offense, were convicted and sentenced:

Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any *building,* vehicle, or other real or personal property used in interstate or foreign commerce or *in any activity affecting interstate* or foreign commerce shall be imprisoned for not more than ten years or fined not more than $10,000, or both; and if personal injury results to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this subsection, shall be imprisoned for not more than

twenty years or fined not more than $20,-000, or both. . . .

18 U.S.C. § 844(i) (1988) (emphasis added).

First, Sherlin and Teague rely on *Russell v. United States,* 471 U.S. 858, 859–60, 105 S.Ct. 2455, 2456–57, 85 L.Ed.2d 829 (1985), which held that the legislative history of 18 U.S.C. § 844(i) indicated that Congress intended to protect all "business property," and to exercise its "full power under the Commerce Clause" to that end. The Defendants contend that Ellis Hall was not a "business," nor was it connected to a business in the normal sense of the word. Thus, they claim that the alleged arson was not encompassed by 18 U.S.C. § 844(i), and that consequently, the district court did not have jurisdiction to hear the arson charges.

Contrary to the Defendants' assertion, we find that Congress intended 18 U.S.C. § 844(i) to encompass acts of arson such as the malicious burning of Ellis Hall. The plain language of the statute prohibits the malicious destruction, by means of fire, of any "building ... used ... in any activity affecting interstate or foreign commerce." 18 U.S.C. § 844(i). Ellis Hall was clearly a "building," and the evidence adduced at trial was more than sufficient to establish that Ellis Hall was used in an activity affecting interstate commerce.

At trial, Dr. Paul Conn, the "CEO" of Lee College, testified that Lee College "was in the business of providing educational services at the undergraduate level[;] people pay us money to teach them and provide them with college credit." He also testified that Lee College advertised out-of-state. As a result, Lee College had over 2,000 full-time students when the fire occurred and eighty-six percent of those students were from out-of-state. Significantly, the seventy-six students living in the Ellis Hall dormitory at the time of the fire were residents of twenty-one different states. Only four of the Ellis Hall residents were from Tennessee; the other seventy-two were from other states and countries.

Dr. Conn also noted that Lee College purchased numerous supplies from out-of-state. For example, approximately $1,000,000 worth of out-of-state food services was supplied by the Washington, D.C.-based Marriott Corporation.

Clearly, the educational business of Lee College was an activity affecting interstate commerce, and Ellis Hall was a building used in that activity. 18 U.S.C. § 844(i). Thus, the plain language of the statute encompassed the Defendants' act of arson.

■ At oral argument, the Defendants raised another fundamental challenge to the court's jurisdiction. Relying on *United States v. Lopez,* ⸺ U.S. ⸺, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the Defendants contended that 18 U.S.C. § 844(i) exceeded the authority of Congress under the U.S. Constitution to regulate commerce among the several states. U.S. Const., art. I, § 8, cl. 3. In *Lopez,* a 12th-grade student, who carried a concealed handgun into his high school, was charged with violating the Gun–Free School Zones Act of 1990, which made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone," 18 U.S.C. § 922(q)(1)(A) (Supp. V 1993). *Lopez,* ⸺ U.S. at ⸺, 115 S.Ct. at 1626. The Supreme Court found problematic that the statute "neither regulate[d] a commercial activity nor contain[ed] a requirement that the possession be connected in any way to interstate commerce." *Id.* With regard to the latter point, the Court noted that 18 U.S.C. § 922(q) did not contain a "jurisdictional element, which would ensure, through case-by-case inquiry, that the firearm possession in question affect[ed] interstate commerce." *Lopez,* ⸺ U.S. at ⸺, 115 S.Ct. at 1631. Thus, the Court held that the statute exceeded Congress' authority under the Commerce Clause "[t]o regulate the Commerce ... among the several States," U.S. Const., art. I, § 8, cl. 3. *Lopez,* ⸺ U.S. at ⸺, 115 S.Ct. at 1626.

Unlike the unconstitutional statute in *Lopez,* 18 U.S.C. § 844(i) does contain a jurisdictional element, which ensures, through proper inquiry, that the arson in question affects interstate commerce. The statute specifically requires that the burned building must have been "used in interstate ... commerce" or "used ... in an activity affecting

interstate ... commerce." 18 U.S.C. § 844(i). Thus, *Lopez* is distinguished from the present case, and we find that Congress did not exceed its authority under the Commerce Clause when it enacted 18 U.S.C. § 844(i). In sum, the district court's jurisdiction over this matter was proper.

### B. Sufficiency of the Evidence

■ Both Sherlin and Teague claim that their convictions were based on insufficient evidence. As noted earlier, Sherlin was convicted of conspiracy to commit arson, arson with personal injuries, and perjury. Teague was convicted of conspiracy to commit arson and perjury. We review allegations of insufficient evidence in the following manner:

> The relevant inquiry when reviewing claims of insufficient evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Circumstantial evidence and direct evidence are accorded the same weight and " 'the uncorroborated testimony of an accomplice may support a conviction under federal law.' " *United States v. Frost*, 914 F.2d 756, 762 (6th Cir.1990) (quoting *United States v. Gallo*, 763 F.2d 1504, 1518 (6th Cir.1985), *cert. denied*, 475 U.S. 1017, 106 S.Ct. 1200, 89 L.Ed.2d 314 (1986)). Therefore, we will reverse a judgment for insufficiency of evidence only if, viewing the record as a whole, the judgment is not supported by substantial and competent evidence. *[United States v.] Ellzey*, 874 F.2d [324,] 328 [ (6th Cir.1989) ].

*United States v. Blakeney*, 942 F.2d 1001, 1010 (6th Cir.1991), *cert. denied*, 502 U.S. 1035, 112 S.Ct. 881, 116 L.Ed.2d 785 (1992). Substantial evidence is more than just a scintilla. *United States v. Martin*, 375 F.2d 956, 957 (6th Cir.1967). "It means such relevant evidence as a reasonable mind might accept to support a conclusion." *Id.*

After our thorough review of the record, we are convinced that all of the convictions were supported by substantial and competent evidence such that a rational trier of fact could have found the essential elements of each crime charged beyond a reasonable doubt.

### III. Sherlin's Distinct Claims

### A. Admissibility of Prior Lies Regarding Prior Arson Charges

■ The district court permitted the government to cross-examine Sherlin regarding statements that he had made to arson investigators in 1990, approximately three years before the arson charged in the instant case, in connection with two unrelated fires. Sherlin's statements to the investigators were recorded. In both of these statements, Sherlin initially denied any knowledge of the fires. After questioning, Sherlin admitted that he had originally lied to the investigators and that he knew who set the fires.

The district court permitted the cross-examination pursuant to Federal Rule of Evidence 608(b), which provides the following:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness....

Fed.R.Evid. 608(b). The district court specifically found that the evidence was highly probative and not unfairly prejudicial. Fed.R.Evid. 403. At Sherlin's request, the district court instructed the jury that the evidence was not to be used for any purpose other than to assess Sherlin's credibility.

Sherlin contends that the district court erred in allowing the government to cross-examine him regarding his involvement in the two previous arsons. Sherlin claims any probative value was greatly outweighed by the prejudicial value of the evidence because he was on trial for arson, conspiracy to commit arson, and perjury.

■ This court has held that "[a] trial judge's decision regarding an evidentiary rul-

ing will not be reversed absent a clear showing of abuse of discretion." *United States v. Phillips*, 888 F.2d 38, 40 (6th Cir.1989). Abuse of discretion exists where the reviewing court is firmly convinced that a mistake has been made. *Id.*

The evidence in question clearly fit within the confines of Rule 608(b). The government inquired into the prior arson investigations on cross-examination of Sherlin, and the admitted lies were obviously probative of Sherlin's character for truthfulness or untruthfulness. Moreover, the evidence was not "unfairly prejudicial" to Sherlin. *See United States v. Rey*, 923 F.2d 1217, 1222 (6th Cir. 1991). Under these circumstances, we find that the district court did not abuse its discretion in admitting the evidence.

### B. Motion for Severance

Next, Sherlin argues that the trial court erred in failing to grant Sherlin's Motion for Severance pursuant to Federal Rule of Criminal Procedure 14. The basis for the severance motion was the government's plan to seek admission of portions of two statements of Teague, a nontestifying codefendant, which allegedly contained information that incriminated Sherlin in violation of his Sixth Amendment right to confront the witnesses against him. *See Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (holding that admission of nontestifying codefendant's confession at a joint trial may violate a defendant's confrontation rights if defendant is expressly incriminated).

The decision to grant or deny a severance is within the sound discretion of the trial court. *Zafiro v. United States*, 506 U.S. 534, ——, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993). A defendant must show compelling and specific prejudice to reverse a district court's denial of a severance. *United States v. Sivils*, 960 F.2d 587, 594 (6th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 130, 121 L.Ed.2d 84 (1992). This is so because there is a strong preference in the federal court system for jointly indicted defendants to be tried together. *Zafiro*, 506 U.S. at ——, 113 S.Ct. at 937. The defendant bears a heavy burden since jurors are presumed to follow the court's instruction to consider each defendant's case separately. *Francis v. Franklin*, 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 1976 n. 9, 85 L.Ed.2d 344 (1985); *Sivils*, 960 F.2d at 594.

We find that Sherlin's confrontation rights were adequately protected by measures taken during the trial to avoid any *Bruton* problems, including the district court's instructions to the attorneys. Specifically, counsel for the United States did not offer into evidence statements of Teague that incriminated Sherlin, and the court prevented Teague's attorney from eliciting such statements on cross-examination of the government's witness. The government only offered two statements of Teague. The first was an oral and written statement that he gave to an arson investigator in which he claimed that he was a lookout. The second statement was a portion of Teague's testimony before the grand jury. In neither case was Sherlin's Sixth Amendment right to confrontation compromised.

With regard to the first statement, Sherlin's name was redacted from Teague's statement to the arson investigator, and the district court refused to allow Teague's counsel to elicit on cross-examination of the government witness any statements within Teague's confession that incriminated Sherlin. Subsequent to *Bruton*, the Court declined in *Richardson v. Marsh*, 481 U.S. 200, 208–11, 107 S.Ct. 1702, 1707–09, 95 L.Ed.2d 176 (1987), to take a contextual implication approach or evidentiary linkage approach to *Bruton* questions. In *Marsh*, the confession of a nontestifying codefendant was redacted to omit any reference at all to the defendant. The confession only became incriminating when linked with other evidence introduced at the trial, such as the defendant's own testimony. *Marsh*, 481 U.S. at 208, 107 S.Ct. at 1707–08. The *Marsh* Court found that *Bruton* was distinguishable because, unlike the confession in *Bruton*, the redacted codefendant's confession in *Marsh* did not expressly implicate the defendant as an accomplice. *Marsh*, 481 U.S. at 208, 107 S.Ct. at 1707–08. Thus, the Court held that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when ... the confession

is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id.* at 211, 107 S.Ct. at 1709.

■ As in *Marsh,* Sherlin's name was redacted from Teague's statement to the investigator, and the statement did not expressly implicate Sherlin. *See* J.A. at 284, 319–322. Because Teague's statement was not facially incriminating of Sherlin and could only have been incriminating when linked with other evidence, this redacted statement did not pose *Bruton* problems.[1]

■ Regarding the portion of Teague's testimony before the grand jury, which was admitted at trial in connection with the perjury charges against Teague, it, too, did not violate Sherlin's confrontation rights because it was not offered to prove the truth of the matter asserted. *See* Fed.R.Evid. 801(c). Although the statement did refer to Sherlin, it was the government's position that the statement was false. *Cf. Anderson v. United States,* 417 U.S. 211, 220–221, 94 S.Ct. 2253, 2260–61, 41 L.Ed.2d 20 (1974) ("[T]he point of the prosecutor's introducing those statements was simply to prove that the statements were made so as to establish a foundation for later showing, through other admissible evidence, that they were false.... Here, since the prosecution was not contending that anything [the codefendants] said at the election contest was true, the other defendants had no interest in cross-examining them so as to put their credibility in issue."). Because the government's position was that Teague's grand jury statement, which referred to Sherlin, was false, Sherlin's confrontation rights were not implicated by the admission of the statement.

For all of these reasons, we hold that the district court did not abuse its discretion in denying the severance motion.

*C. Failure to Admit Polygraph Results*

■ At trial, Sherlin sought to admit polygraph test results that allegedly proved that he was truthful when he denied burning the Ellis Hall dormitory and that he did not lie to the grand jury. Relying on the Supreme Court's recent interpretation of Federal Rule of Evidence 702[2] in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), Sherlin contended that the polygraph results were admissible pursuant to Rule 702. The district court ruled, however, that the proposed evidence was inadmissible under Federal Rule of Evidence 403 because its probative value was outweighed by the prejudice. J.A. at 95–96. On appeal, Sherlin contends, based on the same grounds as below, that the court erred in this decision.

■ The decision to exclude from evidence the results of a polygraph examination is within the sound discretion of the trial court. *United States v. Blakeney,* 942 F.2d at 1014. In order to determine whether the results of a polygraph examination should be admitted at trial over an opponent's objections, this court has established a two-step analysis. First, the evidence must be relevant, and second, its probative value must outweigh the prejudice. *United States v. Barger,* 931 F.2d 359, 370 (6th Cir.1991). As a general rule, the results of a polygraph examination are inadmissible. *Blakeney,* 942 F.2d at 1014. Indeed, this circuit has recently stated "that unilaterally obtained polygraph evidence is almost never admissible under Evidence Rule 403." *Conti v. Commissioner,* 39 F.3d 658, 663 (6th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1793, 131 L.Ed.2d 722 (1995).

■ The Sixth Circuit has consistently recognized that in the absence of a prior

---

1. We note that the record in this case does not indicate that the district court gave a limiting instruction to the jury regarding the evidentiary scope of Teague's statement. We do not, however, find the lack of instruction problematic in this case because Sherlin did not request such an instruction. *See United States v. Locklear,* 24 F.3d 641, 646 n. 2 (4th Cir.) (noting that defendant waives right to limiting instruction if he fails to ask for one), *cert. denied,* —— U.S. ——, 115 S.Ct. 278, 130 L.Ed.2d 195 (1994).

2. Federal Rule of Evidence 702 states the following: ·

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702.

agreement between the parties that the results of an examination would be admissible, the probative value of the polygraph is substantially less because the defendant would have no adverse interest at stake in the polygraph. *Id.* at 662–63; *Wolfel v. Holbrook*, 823 F.2d 970, 974 (6th Cir.1987), *cert. denied*, 484 U.S. 1069, 108 S.Ct. 1035, 98 L.Ed.2d 999 (1988). Thus, Sherlin's privately commissioned polygraph test, which was unknown to the government until after its completion, is of extremely dubious probative value.

■ Federal Rule of Evidence 403 provides that even relevant evidence may be excluded if in the discretion of the court "its probative value is substantially outweighed by the danger of unfair prejudice." This court has previously suggested in *Barnier v. Szentmiklosi*, 810 F.2d 594, 597 (6th Cir. 1987), that the use of a polygraph solely to bolster a witness' credibility is "highly prejudicial," especially where credibility issues are central to the verdict. In this case, the district court noted that Sherlin's "credibility is probably, without overstating it, maybe the central issue in this case." J.A. at 590.

■ Although Sherlin relies on *Daubert* and its analysis of Federal Rule of Evidence 702, this court has held that when a defendant unilaterally takes a polygraph, the district court has the separate discretion to exclude the test results under Federal Rule of Evidence 403. *Conti*, 39 F.3d at 662–63. In *Conti*, we rejected the argument that *Daubert* was controlling in these circumstances; Rule 403 offers a basis for excluding polygraph results independent of *Daubert. Conti*, 39 F.3d at 662–63. In the instant case, the district court reached the same conclusion. J.A. at 95–96.

Thus, we find that the district court did not abuse its discretion when it refused to admit this polygraph evidence pursuant to Rule 403 because its probative value was outweighed by the danger of unfair prejudice.

### IV. Teague's Distinct Claims

#### A. Limitation of Cross-examination of Government Witness

During the government's direct examination of Cleveland Fire Department Arson Investigator David McAmis, McAmis testified that Teague admitted to him that he went to Lee College in Charlie Jacks' car and acted as a "lookout." J.A. at 284. Counsel for Teague objected to the investigator's use of the word "lookout" because according to Teague's written statement, Teague said that he was told to "watch out." *Id.* The court overruled the objection and told counsel that he could take that matter up on cross-examination. On cross-examination, counsel for Teague wanted to go beyond Teague's written statement and inquire of the witness whether Teague stated who told him to get out of the car and who told him to watch out. J.A. 305–06. Moreover, counsel for Teague wanted to question the witness regarding portions of the statement that inculpated Sherlin. J.A. at 306–07. The district court ruled that counsel for Teague could cross-examine the witness regarding Teague's statement, but the court limited the cross-examination to exclude references to Sherlin.

Teague claims that the court's limitation of his cross-examination of McAmis denied him his constitutionally mandated right of confrontation and was reversible error. Teague argues that the portions of his statement that he was not permitted to address on cross-examination supported his theory of defense, namely that he was just a follower and had no real knowledge of the activity that was about to take place.

■ We find that the district court correctly limited the cross-examination of McAmis to exclude references to Sherlin. As noted above, this redaction prevented potential *Bruton* problems. Moreover, Teague's statement is actually ambiguous as to who told him to "watch out." The district court properly concluded that it was irrelevant for purposes of Teague's defense who told Teague to watch out. Finally, the portions of Teague's statement, which contained potentially inculpating statements of Sherlin, would not have been admissible if offered into evidence through McAmis because they were hearsay. Fed.R.Evid. 805.

#### B. Denial of Request to Review Presentence Report

■ During the cross-examination of government witness Charlie Jacks, Teague

asked the court for a copy of Jacks' presentence report to further test Jacks' credibility. The government objected to the request for the report. J.A. at 218. At side bar, Teague asked the court to "look at the report *in camera*," but the district court denied Teague's request. J.A. at 220–21. Relying on *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963), Teague claims that the court committed reversible error in denying his request for access to Jacks' presentence report and in refusing to review the presentence report *in camera* for potential *Brady* material.

 The regulation of discovery in criminal matters is committed to the discretion of the trial court. Fed.R.Crim.P. 16(d). Thus, we review for abuse of discretion.

 Although this court has not addressed this particular issue in a published decision,[3] the Fifth Circuit, in *United States v. Trevino*, 556 F.2d 1265, 1270 (5th Cir.1977) did address the issue of whether the Supreme Court's holding in *Brady* required a court, for due process reasons, to provide access for a defendant to a prosecution witness' presentence report. In *Brady*, the Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. at 87, 83 S.Ct. at 1196–97. Recognizing that *Brady* was directed to suppression of available evidence by the *prosecution*, the Fifth Circuit distinguished the application of *Brady* to the facts in *Trevino* because a "presentence report is a report *to the court*, compiled for the court's use in the sentencing process." *Trevino*, 556 F.2d at 1270; *see* Fed.R.Crim.P. 32(b). Thus, the Fifth Circuit declined "to extend *Brady*'s reach by holding that a discovery motion addressed in effect to a court or its probation officer, rather than the prosecution, asking production of a witness' presentence report, must be granted under *Brady*'s authority." 556 F.2d at 1271; *see United States v. Walker*, 491 F.2d 236, 238 (9th Cir.), *cert. denied*, 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974).

We find the Fifth Circuit's reasoning in *Trevino* quite persuasive. *Brady* expressly applies to material evidence withheld from the defense *by the prosecution*. Neither *Brady* nor the Federal Rules of Criminal Procedure mandate that a trial court produce a copy of a presentence report concerning a government witness, prepared for the court, to the defense upon request. Nor do they require a trial court to review such a report *in camera* for potential *Brady* material. Thus, we hold that the district court did not abuse its discretion in denying Teague's request.

## V.

Based on the foregoing analysis, we **AFFIRM** the convictions of both Sherlin and Teague on all counts.

3. A similar issue arose in *United States v. Cunningham*, Nos. 92–3101/3102, 1993 WL 358539 (6th Cir. Sept. 15, 1993) (unpublished per curiam). In *Cunningham*, defense counsel asked the court to disclose the presentence reports of three of the defendant's coconspirators, who previously had pleaded guilty and been sentenced, prior to their testimony at the defendant's trial. Defense counsel thought the presentence reports might contain information that would impugn the witnesses' credibility or tend to exculpate the defendant under *Brady*. The government stated that the reports were not in their possession, but the court agreed to examine the presentence reports after each witness testified to determine whether any discrepancies existed that might reflect upon the witnesses' credibility. After reviewing the reports the district court found no discrepancies or inconsistencies, and it denied defense counsel's discovery request. Relying on *Brady* but with virtually no analysis, this court held that the district court's "review was adequate to satisfy any obligation the court had to ensure the defense had access to exculpatory evidence contained in the [presentence reports], especially since the documents apparently were no longer in the government's control." We note, however, that in *Cunningham*, the district court examined the presentence reports of the government witnesses before it denied the defense access to the reports, and this court, on appeal, was not faced with the issue of whether a district court is *required* to review such a report *in camera* for potential *Brady* material upon the request of the defense.